**Michigan Supreme Court**
**Lansing, Michigan 48909**

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

# Opinion

**FILED JANUARY 11, 2001**

BANDIT INDUSTRIES, INC.,

    Plaintiff-Appellee,

v                                          No. 116553

HOBBS INTERNATIONAL, INC.,
a Connecticut Corporation,
d/b/a HOBBS EQUIPMENT COMPANY,

    Defendant,

and

WILLIAM H. BAYLES, JR.,

    Defendant-Appellant.

_____

(AFTER REMAND)

PER CURIAM

The plaintiff and defendant corporations transacted business with each other. When the latter failed to keep its

account current, the plaintiff sought further assurance. The response was treated by the circuit court as a personal guarantee from the president of the defendant corporation. The Court of Appeals twice affirmed, but we reverse. A personal guarantee for the debt of another can arise only where such an intent is clearly manifested.

I

Plaintiff Bandit Industries, Inc., manufactures wood chipping equipment in Remus, Michigan. Among its dealers was defendant Hobbs International, Inc., of Norwalk, Connecticut. When Hobbs began to fall behind in its financial obligations to Bandit, the two companies tried several means to continue the relationship. Bandit sometimes required Hobbs to pay before shipment, or to pay cash on delivery. Bandit and Hobbs also agreed on a payment schedule, but the problem of delinquency continued.

As these events were taking place, Hobbs found itself in position to sell five specially manufactured wood chippers to the state of Connecticut. Bandit agreed to manufacture the chippers for a price to Hobbs of $87,500.[1] However, discussions continued with regard to how Bandit's financial

---

[1] From the materials at hand, it appears that the price for each of the five chippers was $17,694. However, this case has proceeded on the basis that the total bill was $87,500, and there appears to be no present dispute regarding that figure.

2

stake in the transaction could be protected.

Negotiating on behalf of Bandit was its sales manager and part owner, Dennis Tracy. On Hobbs' side were its sales manager, and also a financial consultant named Rosemarie Rourke. They discussed various options, including having the state of Connecticut issue a two-party check, or having Hobbs' contractual obligation backed by a personal guarantee for the contract amount. Ms. Rourke spoke with the president and owner of Hobbs, William H. Bayles, Jr. Ms. Rourke and Mr. Bayles say that they agreed between themselves that a personal guarantee would be unwise. However, these various conversations led directly to the following letter, sent by facsimile transmission in October 1993. The letter, on Hobbs stationery, was faxed to Mr. Tracy. In full, it stated:

> Dear Dennis:
>
> Rosemarie just informed me of your great cooperation to work with us to retain the order from the State of Connecticut, and our commitment to pay you promptly when we get paid by the state. Please accept this fax as my assurance that you will be paid when we are. Thanks for working with us.
>
> Sincerely,
>
> *Bill* [handwritten]

On receipt of that fax, Bandit shipped the chippers to the state of Connecticut and sent invoices to Hobbs. Connecticut paid Hobbs for the chippers, but Hobbs never sent the promised $87,500 to Bandit.

3

When it became clear that no payment would be forthcoming,[2] Bandit sued Hobbs and Mr. Bayles. The present appeal concerns only Bandit's claim that Mr. Bayles is personally liable as a guarantor of Hobbs' obligation to pay for the chippers.[3]

Mr. Bayles moved for summary disposition under MCR 2.116(C)(10), arguing that, as a matter of law, the contents of the fax were insufficient to constitute his personal guarantee.[4] Bandit's response to the motion included an

---

[2] The plaintiffs' August 1995 complaint states that Hobbs "was under the protection of the United States Bankruptcy Court in the District of Connecticut from December 2, 1993 until that case was dismissed on May 2, 1995, on a Voluntary Petition for reorganization under Chapter 11 of the Bankruptcy Code." The complaint further states, "That pending case has been dismissed without discharge of debts." In his answer, Mr. Bayles admitted those portions of Bandit's complaint.

[3] Hobbs did not answer, and was defaulted. The affidavit in support of entry of the default listed damages of $110,019.18, plus interest and costs, in a total amount of $119,317.67. While Bandit has argued that Mr. Bayles guaranteed the whole amount, the circuit court later found him liable only for the $87,500 owed on the five custom-made chippers. At this stage, the proceedings concern that judgment amount, only.

[4] We should here say two things with regard to terminology. First, the words "guarantee" and "guaranty" appear throughout this case. As we shall explain, a person's guarantee can give rise to a "guaranty contract." Second, with regard to the distinction between a "surety contract" and a "guaranty contract," we note the following passage from 23 Michigan Civil Jurisprudence, Surety, § 14, p 50.

> While a contract of suretyship and of guaranty are not the same in all respects, they are similar in certain particulars. Each requires three parties, the principal, the obligee, and the surety

4

amended complaint, in which it alleged that it had relied on the fax to its detriment, enriching Hobbs by sending the chippers——which it would not have shipped without the fax——to Connecticut.

The circuit court denied the motion, concluding that there were factual issues in the case and that it was not clear whether the "sloppily drafted" fax was a personal guarantee.

Mr. Bayles later renewed his motion for summary disposition under MCR 2.116(C)(10), providing additional factual background concerning the events that preceded the fax. Bandit filed a cross-motion for summary disposition under the same paragraph of the rule.

The circuit court again denied the motions "for the reason that there exist disputed issues of fact which preclude summary disposition at this time."

The circuit court then conducted a bench trial. After

---

or guarantor. In both the contract of suretyship and guaranty, the surety and the guarantor promise to answer for the debt or default of another. The main distinction between a contract of suretyship and of guaranty, however, is that while the surety assumes liability as a regular party to the primary undertaking, the guarantor does not, as his or her liability depends on an independent collateral agreement by which he or she undertakes to pay the obligation if the primary payor fails to do so. Nevertheless, the authorities in discussing certain principles common to both forms of contract often use the terms surety and guarantor interchangeably.

5

hearing the evidence, the court directed the clerk to draft a judgment against Hobbs. The court reserved its ruling with regard to the liability of Mr. Bayles.[5]

About a month later, the circuit court issued a written opinion. It said that "an assurance is a guarantee" and that the key issue was whether Mr. Bayles offered this guaranty contract in his capacity as president of Hobbs, or personally. Regarding that question, the court relied on *St Joseph Valley Bank v Napoleon Motors Co*, 230 Mich 498; 202 NW 933 (1925), for the distinction between a corporate signature and a personal signature. The court then gave an example of the form of signature that would have indicated a corporate guarantee:

> Hobbs International, Inc.
> /s/ William Bayles
> President

Because Mr. Bayles signed without the corporation name or his corporate title, the court concluded that "there is a personal guarantee made by Mr. Bayles." The court entered judgment against Mr. Bayles in the amount of $87,500.[6]

Mr. Bayles appealed, but the Court of Appeals affirmed.[7]

---

[5] It also reserved its ruling on Mr. Bayles' midtrial motion for directed verdict.

[6] In a separate opinion, the court denied the motion for directed verdict.

[7] Unpublished opinion per curiam, issued June 9, 1998, reh den August 5, 1998 (Docket No. 201781).

In doing so, the Court said that "[g]eneral rules of construction apply in interpreting guaranty contracts," adding that "[t]he primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Rasheed v Chrysler Corp*, 445 Mich 109, 127, n 28; 517 NW2d 19 (1994). Examining the language of the fax, the Court of Appeals then listed eight reasons why "the words and circumstances of this facsimile" demonstrate that the intent of the parties was that Mr. Bayles would personally guarantee payment for the five chippers.[8]

Mr. Bayles applied to this Court for leave to appeal. In lieu of granting leave, we remanded this case to the Court of

---

[8] The Court of Appeals noted these aspects of the case: (a) the fax used the word "assurance"; (b) though the fax spoke of "*our* commitment to pay you promptly when *we* get paid," it later referred to "*my* assurance that you will be paid when we are"; (c) though written informally, "the entirety of the facsimile reasonably appears to communicate a guarantee to pay plaintiff"; (d) the fax was simply signed, "Bill," without the name of the corporation or Mr. Bayles's title; (e) since the contract between the parties would have obligated Hobbs to pay Bandit for the five chippers in any event, interpreting the fax as a *corporate* guarantee would render it of no additional value to Bandit; (f) Mr. Tracy specifically asked for a personal guarantee from Mr. Bayles, and it is reasonable to construe the response in light of that request; (g) the assurance obviously was intended to (and did) induce reliance on the part of Bandit, which would not have shipped the chippers without the assurance; and (h) the fax was sent in response to the request for a personal guarantee. Mr. Bayles and Hobbs did not reject that request or make a counter proposal. Instead, Mr. Bayles simply sent the fax.

Appeals for further consideration.[9]  461 Mich 861 (1999).  In our order, we directed the attention of the Court of Appeals to the manner in which the word "assurance" is used in § 2-609 of the Uniform Commercial Code, MCL 440.2609; MSA 19.2609, and in the United States Bankruptcy Code, 11 USC 365(b)(1)(C).  In each instance, it appears to refer to something less than a separate guarantee of payment.

On remand, the Court of Appeals again affirmed.[10]  It found neither MCL 440.2609; MSA 19.2609 nor 11 USC 365(b)(1)(C) applicable in the present case.

Mr. Bayles has renewed his application to this Court for leave to appeal.

II

---

[9]

In lieu of granting leave to appeal, the case is remanded to the Court of Appeals for reconsideration of arguments made by the defendant-appellant which the Court of Appeals did not address. . . .  The defendant-appellant claimed that the circuit court erred as a matter of law in refusing to enter summary disposition or a directed verdict in his favor.  Specifically, the panel did not address the defendant-appellant's arguments that he was entitled to judgment as a matter of law because the use of the term "assurance" in the October 8, 1993, facsimile did not create a guaranty contract given that the definition of the critical term "assurance" as used in the Uniform Commercial Code, UCC 2-609, MCL 440.2609; MSA 19.2609 and in the United States Bankruptcy Code, 11 USC 365(b)(1)(C), contemplates something less than a "guaranty."  Jurisdiction is not retained.

[10] Unpublished opinion per curiam, issued November 30, 1999, reh den March 2, 2000 (Docket No. 201781).

This case involves the interpretation of language that is said to form a contract. "The proper construction and interpretation of [a] contract is a question of law we review de novo. *Morley v Automobile Club of Michigan*, 458 Mich 459, 465; 581 NW2d 237 (1998)." *Perry v Sied*, 461 Mich 680, 681, n 1; 611 NW2d 516 (2000).

## III

As the Court of Appeals noted in its first opinion, the record contains facts from which one could conclude that Bandit wanted a personal guarantee from Mr. Bayles, and from which one could conclude that Bandit understood the fax to be that guarantee.

However, a guaranty contract——like a surety contract——is a special kind of contract. As this Court stated in *Ann Arbor v Massachusetts Bonding & Ins Co*, 282 Mich 378, 380; 276 NW 486 (1937),

> The undertaking of a surety is to receive a strict interpretation. The surety has a right to stand on the very terms of the contract. To the extent and in the manner and under the circumstances pointed out in his obligation, the surety is bound, and no further. The liability of a surety is not to be extended by implication beyond the terms of his contract. *Miller v Steward*, [22 US (9 Wheat) 680; 6 L Ed 189 (1824)]. A surety cannot be held beyond the precise terms of his agreement. *Walsh v Bailie*, 10 Johns 180 [NY Supp, 1813]. As said by Chancellor Kent, "The claim against a surety is *strictissimi juris*." 3 Kent's Commentaries (14th Ed), p 217. See, also, *Fellows v Prentiss*, 3 Denio 512 (45 Am Dec 484) [NY, 1846].

9

It is evident that other jurisdictions likewise apply the principle of strict interpretation to the construction of such a contract.[11]

For these reasons, a court must approach with caution a claim that the parties have formed a guaranty contract. Ordinary experience teaches that assumption of another's debt is a substantial undertaking, and thus the courts will not assume such an obligation in the absence of a clearly expressed intention to do so. These principles have been in

---

[11]

> In many jurisdictions a gratuitous surety——as distinguished from compensated sureties and surety companies——is said to be a favorite of the law. The contract is to be construed strictly in his favor under the rule generally known as "strictissimi juris." The reason for this is that the surety is not the recipient of the full consideration which has accrued or may accrue to the recipient of the full consideration which has accrued or may accrue to the principal debtor, and further, his situation is comparatively a dependent one, since he does not enjoy the opportunity of protecting himself that belongs to the other parties to the contract.

> Where the rule of strict construction in favor of the surety is applied, he undertakes nothing that is not within the strict letter of his contract; he is bound to the extent, and in the manner, and under the circumstances, pointed out in his obligation and no further. Otherwise stated the rule means that the surety's obligations cannot be extended by implication or enlarged by construction beyond the terms of the agreement entered into, so as to include any other subject, or other person, or other period of time than that expressed or necessarily included in the agreement. [74 Am Jur 2d, Suretyship, § 27, pp 29-30.]

place in Michigan for over a century. *The Columbus Sewer Pipe Co v Ganser*, 58 Mich 385; 25 NW 377 (1885).

In *Columbus Sewer Pipe*, a man named August Ganser personally guaranteed up to $3,000 of the cost of purchasing pipe. The guaranty contract was executed in connection with a sewer project along First Street in Bay City. A dispute later arose regarding whether the guaranty contract was in force for other purchases, or just for the purchase of pipe used in the First Street project. This Court said that the intent of the parties was the controlling element in the interpretation of the guaranty contract and that, under the circumstances found in *Columbus Sewer Pipe*, Mr. Ganser's guarantee was limited to the cost of the pipe for the First Street project. As the Court explained, "[a] guarantor is not liable beyond the express terms of his contract." 58 Mich 391.

These authorities confirm the principle enunciated by the Court of Appeals——that the intention of the parties must be given effect. However, the Court of Appeals has failed to apply a more fundamental principle of law. As this Court explained 115 years ago in *Columbus Sewer Pipe*, "[t]he rights of sureties are always favored in the law, and persons standing in that relation in this class of obligations will not be held, unless an intention to bind themselves is clearly manifested." 58 Mich 391.

11

In the present case, the fax is insufficient, as a matter of law, to constitute a binding personal guarantee by Mr. Bayles. The Court of Appeals is correct that the surrounding facts evidence Bandit's desire for a personal guarantee, and even its hope or belief in that regard. However, such a belief cannot reasonably be maintained, nor can such an obligation lawfully be imposed, in the absence of an unambiguous expression of the guarantor's intention to accept that responsibility.

No specific form of language is necessary—*Columbus Sewer Pipe* teaches that such documents "are frequently given without much care as to the language" and that "[t]echnical nicety should not, therefore, be applied in their construction." 58 Mich 391. The point, however, is that a personal guarantee cannot be implied from language that fails to clearly and unambiguously reflect an intention to assume such a responsibility.

In the present case, the disputed fax speaks of "*my* assurance," but it also mentions "*our* commitment." Twice it recites Bandit's cooperation in working "with *us*," and twice it says that Bandit will be paid when "*we*" are. In particular, the assurance of being paid "when we are" reflects a commitment to pay plaintiff out of *corporate* funds rather than out of anyone's personal funds. The informal signature on the fax (a handwritten "Bill") implies neither a corporate

12

signature as officer nor a personal assumption of a grave responsibility (one would not sign a note of indebtedness for $87,500 with an unadorned "Bill"). And the term "assurance" has developed a commercial usage that is not synonymous with a guarantee or a guarantee contract.[12]

As indicated above, the fax sent to Mr. Tracy could not, as a matter of law, have been a personal guarantee from Mr. Bayles, giving rise to a guaranty contract. Accordingly, it

---

[12] That was the point of our citation of MCL 440.2609; MSA 19.2609 and 11 USC 365(b)(1)(C) in the remand order. 461 Mich 861 (1999). For instance, the state provision (§ 2-609 of the UCC) says this about "assurance":

(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

(2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

(3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.

(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

13

was error for the circuit court to deny Mr. Bayles' motions for summary disposition, and it was error to enter judgment against him for the $87,500 price of the five custom-made chippers.

For these reasons, we reverse the judgments of the Court of Appeals and the circuit court, and we remand this case to the circuit court for entry of a judgment in favor of the individual defendant. MCR 7.302(F)(1).

CORRIGAN, C.J., and WEAVER, TAYLOR, and YOUNG, JJ., concurred.

STATE  OF  MICHIGAN

SUPREME COURT

BANDIT INDUSTRIES, INC.,

    Plaintiff-Appellee,

v                                                                No. 116553

HOBBS INTERNATIONAL, INC.,
a Connecticut Corporation,
d/b/a HOBBS EQUIPMENT COMPANY,

    Defendant,

and

WILLIAM H. BAYLES, JR.,

    Defendant-Appellant.

_____

CAVANAGH, J.

    I would not decide this case by a per curiam opinion. Because this case offers the opportunity to address a jurisprudentially significant issue, I would grant leave so we might avail ourselves of full briefing and argument by the parties.

    **KELLY, J., concurred with CAVANAGH, J.**

    **MARKMAN, J., took no part in the decision of this case.**