NORTHLINE EXCAVATING, INC v LIVINGSTON COUNTY

Docket Nos. 304964, 305689. Submitted October 3, 2013, at Lansing. Decided October 15, 2013, at 9:05 a.m.

The Livingston County Board of Public Works brought an action in the Livingston Circuit Court against Hanover Insurance Company, Northline Excavating, Inc., and others, seeking to recover under a performance bond issued by Hanover on behalf of Northline for Northline's alleged breach of a contract with the board and Livingston County to construct a sanitary sewer pipe and pump station. Northline and Hanover also brought a separate action in the Livingston Circuit Court against Livingston County, the Livingston County Board of Public Works (collectively "the county"), and others, seeking a determination regarding their liability under the performance bond. The court in both actions, Michael P. Hatty, J., held that the liability of Northline and Hanover for combined actual damages, liquidated damages, and attorney fees could not exceed the penal sum of the performance bond, $251,035. The county appealed by leave granted the orders of the court in both actions. The Court of Appeals consolidated the appeals.

The Court of Appeals *held*:

Michigan's common law has long recognized that a surety's liability is limited to the face amount of the performance bond. The language of the performance bond permitting enforcement of any remedy available to the owner merely confers the right to pursue any cause of action that may prevent or redress a wrong resulting from a breach of the performance bond, but does not implicate what damages may be obtained. The performance bond contains no language specifically expanding the surety's liability beyond the amount of the performance bond.

Affirmed.

BONDS — PERFORMANCE BONDS — SURETY'S LIABILITY — COMMON LAW.

The common law of Michigan recognizes that a surety's liability with regard to a performance bond is limited to the face amount of the bond.

*Cummings, McClorey, Davis & Acho, PLC* (by *Lindsey A. Kaczmarek* and *T. Joseph Seward*), for Livingston County and the Livingston County Board of Public Works.

*Deneweth, Dugan & Parfitt, PC* (by *Ronald A. Deneweth*, *Chris Parfitt*, and *Deborah S. Walter*), for Hanover Insurance Company.

Amici Curiae:

*The Hubbard Law Firm, PC* (by *Michael G. Woodworth*, *Andria M. Ditschman*, and *N. Banu Colak*), for the Michigan Association of County Drain Commissioners, the Michigan Townships Association, and the Michigan Association of Counties.

*Kerr, Russell and Weber, PLC* (by *Joanne Geha Swanson*), for the Surety & Fidelity Association of America.

Before: HOEKSTRA, P.J., and RONAYNE KRAUSE and BOONSTRA, JJ.

HOEKSTRA, P.J. In these cases involving the interpretation of a contract Livingston County and the Livingston County Board of Public Works (collectively "the County") appeal by leave granted the trial court's orders limiting Hanover Insurance Company's (Hanover) actual and liquidated damages. Because we conclude that the plain language of the suretyship contract limited the liability of Hanover to the amount of the performance bond, we affirm.

These consolidated appeals arise from the failure of Northline Excavating, Inc (Northline), to complete a sanitary sewer extension project in Livingston County and the County's attempt to collect damages for nonperformance of a contract under the terms of a perfor-

mance bond issued by Hanover on behalf of Northline. In 2007, the County entered into a contract with Northline to construct a sanitary sewer pipe and pump station along Grand River Avenue. The contract price was Northline's bid of $251,035. The contract also included a liquidated damages provision of $1,000 a day for each day the contract remained substantially uncompleted beyond the date for completion provided in the contract. In order to comply with MCL 129.201, which requires a contractor to provide a performance bond for public-sector contracts exceeding $50,000, Northline and Hanover executed a performance bond. The amount of the performance bond was $251,035, and the bond identified Northline as the "Contractor" (i.e., the principal contractor), Hanover as the "Surety," the County as the "Owner" (i.e., the obligee), and the contract as the "Construction Contract."

The performance bond contains the following provisions regarding Hanover's obligations as surety under the bond:

> 3. If there is no Owner Default, the Surety's obligation under this Bond shall arise after:
>
> 3.1 The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and
>
> 3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the

contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

3.3 The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

4. When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

4.1 Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract; or

4.2 Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

4.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

4.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

.1 After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or

.2 Deny liability in whole or in part and notify the Owner citing reasons therefor.

5. If the Surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Subparagraph 4.4, and the Owner refuses the payment tendered or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

6. After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. To the limit of the amount of this bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:

6.1 The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

6.2 Additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4; and

6.3 Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.[1]

---

[1] We note that the performance bond at issue in these cases is a standard contract of the American Institute of Architects, form A312.

The parties agree that shortly after Northline began excavation and sewer installation it encountered difficulties constructing the sewer extension pursuant to the terms and specifications of the construction contract. There is a factual dispute regarding whether the problematic conditions were disclosed by the County in the plans and specifications of the project. It is not disputed that the parties held a conference as required by the performance bond to discuss methods by which Northline could perform the construction contract. According to the County, the parties failed to reach any agreement at the conference. Northline agreed to submit a "plan of action" detailing how it would complete the project. However, the County ultimately rejected Northline's initial and revised action plans, and notified Northline of its rejection by way of letter. The County similarly notified Northline in a letter that it was declaring a contractor default and terminating Northline's contract. Thereafter, the County notified Hanover of its declaration of a contractor default with regard to Northline for noncompliance with the provisions of the construction contract. Hanover acknowledged receipt of the County's letter and notified the County that it was investigating its claim. Eventually, Hanover denied liability and notified the County of its position by way of letter.

Thereafter, the County commenced suit against Northline and Hanover. The County sought to recover against Northline under a breach of contract theory. It sought to recover under the performance bond against Hanover. Additionally, Northline and Hanover, the latter pursuant to its right of subrogation, commenced suit against the County as well as other parties not relevant to the contract issue on appeal. At a pretrial conference, the trial court adjourned the trial indefinitely to allow the parties to submit briefs addressing

whether Hanover's liability for damages could exceed the penal sum of the performance bond. The parties submitted briefs on the issue, and Hanover filed a motion in limine to limit its potential liability to the penal sum of the performance bond. Following a hearing, the trial court ruled from the bench that Hanover's liability under the terms of the performance bond was limited to the penal sum of the bond.

Immediately after the trial court finished its bench ruling, counsel for the County inquired whether the trial court was limiting Hanover's liability for combined actual damages, liquidated damages, and reasonable attorney fees to the penal sum of the bond. The trial court responded by directing the parties to brief the question whether Hanover could be held liable for liquidated damages in an amount in excess of the penal sum of the bond. Following the parties' submission of briefs, the proceedings were reconvened to consider the County's motion in limine to allow liquidated damages in an amount in excess of the penal sum of the bond. The trial court denied the motion from the bench, finding that the language of the contract limited the recovery of all damages to the amount of the performance bond. Thereafter, these appeals ensued.

The issue on appeal is whether the plain language of the performance bond expressed an intent contrary to the generally understood principle that a surety is liable only for the amount of the bond.

We review de novo questions involving the proper interpretation of a contract. *Rory v Continental Ins Co*, 473 Mich 457, 464; 703 NW2d 23 (2005). "In ascertaining the meaning of a contract, we give the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument." *Id*. We must "give effect to every word, phrase, and clause

in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003). We cannot read words into the plain language of a contract. *Terrien v Zwit*, 467 Mich 56, 75; 648 NW2d 602 (2002).

The contract at issue is required by statute. MCL 129.201 provides that a performance bond must be provided by a principal contractor before construction can begin on any public building project exceeding $50,000 in value. MCL 129.202, which explains the required performance bond, provides:

> The performance bond shall be in an amount fixed by the governmental unit but not less than 25% of the contract amount, conditioned upon the faithful performance of the contract in accordance with the plans, specifications and terms thereof. The bond shall be solely for the protection of the governmental unit awarding the contract.

"A performance bond assures completion of a project in the event of default by the general contractor." *Kammer Asphalt Paving Co, Inc v East China Twp Sch*, 443 Mich 176, 179 n 4; 504 NW2d 635 (1993). The performance bond contract is a suretyship contract, which involves a principal, an obligee, and a surety. *Will H Hall & Son, Inc v Ace Masonry Constr, Inc*, 260 Mich App 222, 228; 677 NW2d 51 (2003). "A surety is one who undertakes to pay money or take any other action if the principal fails therein." *Id.* at 228-229. "The liability of a surety is limited by the scope of the liability of its principal and the precise terms of the surety agreement." *Id.* at 229 (citation and quotation marks omitted). See also *Bandit Indus, Inc v Hobbs Int'l, Inc (After Remand)*, 463 Mich 504, 511-512; 620 NW2d 531 (2001) ("To the extent and in the manner and under the circumstances pointed out in his obligation, the surety

is bound, and no further. The liability of a surety is not to be extended by implication beyond the terms of his contract.") (citation and quotation marks omitted).

Further, Michigan law has long recognized that a surety is only liable for the amount of the performance bond. See, e.g., *Graff v Epstein*, 238 Mich 227, 232; 213 NW 190 (1927) ("Of course, liability of the sureties cannot exceed the penalty of the bond."); *Fidelity & Deposit Co of Maryland v Cody*, 278 Mich 435, 444; 270 NW 739 (1936) (holding that "the penalty of the respective bonds is the measure of the total liability of the surety company"); *Shambleau v Hoyt*, 265 Mich 560, 573; 251 NW 778 (1933) (holding that "defendants and their surety bound themselves to the extent of the penal sum of the bond."); *Vreeland v Loeckner*, 99 Mich 93, 95; 57 NW 1093 (1894) ("The judgment is valid in its entirety as to the principal defendant, but void as to the surety in the excess over the penal sum of the bond."); *Spencer v Perry*, 18 Mich 394, 399 (1869) (holding that it is generally understood that bonds "fix the limit beyond which the liability of the defendant should not extend," and noting that if the parties intended to provide for indefinite liability, they could have entered into a different type of agreement).

Thus, in light of the fact that performance bonds have traditionally been interpreted to limit a surety's liability to the amount of a performance bond, we will not presume that Hanover's liability is greater than the amount of the bond unless the contract language plainly expresses the parties' intent to expand Hanover's liability contrary to the general interpretation and understanding of performance bonds.

The County maintains that the language of the performance bond does plainly express an intent to expose Hanover to liability exceeding the amount of the

bond. Specifically, the County argues that ¶ 6 does not control damages in this case because Hanover proceeded under subparagraph 4.4, and ¶ 6 only applies if a surety elects to arrange for completion of the construction project as provided under subparagraphs 4.1, 4.2, or 4.3.[2] It argues that because ¶ 6 does not apply when a surety proceeds under subparagraph 4.4, the language of ¶ 5 that permits an owner to enforce "any remedy available" is controlling. The County argues that this language in ¶ 5 removes the limitation on the surety's damages expressed on the face of the bond and in ¶ 6 and allows it to pursue damages beyond the amount of the performance bond.

While we agree with the County that ¶ 6 does not apply when the surety elects to proceed under subparagraph 4.4,[3] we disagree with the County's argument that the language in ¶ 5 permitting the owner to enforce "any remedy available" subjects the surety to liability beyond the amount of the performance bond. We find the County's argument regarding the meaning of ¶ 5 unavailing because it misinterprets the term "remedy" to encompass both causes of action and damages. "Remedy" is defined as "[t]he means of enforcing a right or preventing or redressing a wrong; legal or equitable relief." Black's Law Dictionary (9th ed). In contrast, "damages" is defined as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." *Id.* Applying these definitions to the contract in

---

[2] The County does not dispute that when ¶ 6 applies, the plain language of the contract limits the surety's liability to the amount of the performance bond.

[3] Paragraph 6 specifically limits its provisions by stating "if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 . . . ." Paragraph 6 then lists the damages that the surety is liable for "[t]o the limit of the amount of this bond . . . ." Paragraph 6 is silent in regard to the surety's election to proceed under subparagraph 4.4.

this case, the language permitting enforcement of "any remedy available to the Owner," merely confers the right to pursue any cause of action that may prevent or redress a wrong resulting from a breach of the performance bond, but it does not implicate what damages may be obtained.[4]

Thus, neither ¶ 5 nor ¶ 6 addresses the surety's liability when it proceeds under subparagraph 4.4. However, the contract is not completely silent in regard to the surety's liability when it elects to proceed under subparagraph 4.4 because the face of the bond clearly states that the bond amount is $251,035, and our common law has long recognized that a surety's liability is limited to the face amount of the performance bond. See, e.g., *Graff*, 238 Mich at 232; *Shambleau*, 265 Mich at 573; *Vreeland*, 99 Mich at 95. Moreover, the performance bond contains no language specifically expanding the surety's liability beyond the amount of the performance bond. Accordingly, we conclude that the trial court did not err by holding that Hanover's liability is limited to the amount of the performance bond.

Affirmed.

RONAYNE KRAUSE, J., and BOONSTRA, J., concurred with HOEKSTRA, P.J.

---

[4] Consequently, we find the County's reliance on the maxim *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another) unavailing because the absence of language limiting the scope of the remedies an owner may pursue has no bearing or relation to the inclusion of language limiting the scope of damages.