# STATE OF MICHIGAN

# COURT OF APPEALS

STERLING BANK & TRUST, F.S.B.,

Plaintiff-Appellee,

v

SC SOUTHFIELD-TWELVE ASSOCIATES,
L.L.C., and MARK A. CANVASSER,

Defendants-Appellants.

UNPUBLISHED
November 19, 2015

No. 322325
Oakland Circuit Court
LC No. 2009-103711-CK

Before: JANSEN, P.J., and MURPHY and RIORDAN, JJ.

PER CURIAM.

The proceedings underlying this appeal spanned nearly five years, during which plaintiff, Sterling Bank and Trust, FSB, sought to recover on a promissory note and leasehold mortgage executed by defendant SC Southfield-Twelve Associates, LLC, and a guaranty executed by defendant Mark A. Canvasser.[1] The trial court entered a judgment awarding plaintiff $902,120.85 in damages against SC STA on the basis of its liability for the mortgage debt. The trial court ordered Canvasser to pay a 25% share of SC STA's outstanding debt, and it ordered foreclosure of the leasehold mortgage. Defendants appeal as of right. We affirm.

## I. FACTUAL BACKGROUND

On April 16, 1998, SC STA executed a promissory note and mortgage, under which SC STA received a $1,125,000 commercial loan and plaintiff obtained a leasehold mortgage on SC STA's leasehold interest in commercial property located in Southfield, Michigan. At the time, Canvasser and David L. Steuer, who is not a party in this case, signed a guaranty agreement, under which they unconditionally guaranteed, among other things, "the full and prompt payment and collection when due, whether by acceleration or otherwise, and at all times hereafter, of: (a) the top twenty five percent (25 %) of the outstanding indebtedness on the Mortgage Note . . . ."

---

[1] We will refer to defendant SC Southfield-Twelve Associates, LLC, as "SC STA" and defendant Mark Canvasser as "Canvasser" in this opinion.

-1-

Following two loan modifications, plaintiff filed a two-count complaint against SC STA in September 2009, under which it (1) alleged that SC STA breached the promissory note and (2) requested the appointment of a receiver over the property covered by the leasehold mortgage. In October 2009, the trial court appointed a receiver over the property. In February 2010, plaintiff filed a first amended complaint, which included an additional count against Canvasser alleging that he violated the terms of the guaranty agreement.[2]

In July 2010, plaintiff filed a motion for summary disposition under MCR 2.116(C)(10) regarding the extent of Canvasser's liability under the guaranty agreement. Defendants subsequently filed a motion to compel plaintiff to mitigate its damages by immediately foreclosing on the leasehold mortgage. Additionally, Canvasser filed a response in opposition to plaintiff's motion for summary disposition, in which he sought the entry of judgment in his favor under MCR 2.116(I). The trial court granted plaintiff's motion for summary disposition, entering a judgment against Canvasser for $209,979.71, and denied defendants' motion to compel foreclosure on the leasehold mortgage.

In September 2011, the trial court held a bench trial on plaintiff's breach of contract claim against SC STA and the judicial foreclosure claim. In February 2014, the trial court entered an opinion and order in favor of plaintiff. In June 2014, the trial court entered a final judgment (1) awarding plaintiff $902,120.85 in damages against SC STA for breaching the promissory note and mortgage, (2) amending the original judgment against Canvasser so that Canvasser is liable for 25% of the current judgment against SC STA, and (3) ordering judicial foreclosure on the leasehold mortgage, with the understanding that the money judgments against defendants would be adjusted following the foreclosure sale.

## II. STANDARDS OF REVIEW

On appeal, defendants challenge multiple orders and judgments entered by the trial court. However, defendants' claims are rooted in the trial court's order granting summary disposition in favor of plaintiff as to Canvasser's liability under the guaranty, its opinion and order after trial on plaintiff's breach of contract and judicial foreclosure claims, and its final judgment against defendants.

This Court reviews *de novo* a trial court's grant or denial of summary disposition. *Moraccini v Sterling Hts*, 296 Mich App 387, 391; 822 NW2d 799 (2012). When reviewing a motion for summary disposition pursuant to MCR 2.116(C)(10), which tests the factual sufficiency of the plaintiff's claim, *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004), this Court may only consider, in the light most favorable to the party opposing the motion, the evidence that was before the trial court, which consists of "the 'affidavits, together with the pleadings, depositions, admissions, and documentary evidence then filed in the action or submitted by the parties,' " *Calhoun Co v Blue Cross Blue Shield Michigan*, 297 Mich App 1, 11-12; 824 NW2d 202 (2012), quoting MCR 2.116(G)(5). Under MCR 2.116(C)(10),

---

[2] Much later in the proceedings, plaintiff filed a second amended complaint, under which plaintiff requested judicial foreclosure.

"[s]ummary disposition is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008). "There is a genuine issue of material fact when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008). "This Court is liberal in finding genuine issues of material fact." *Jimkoski v Shupe*, 282 Mich App 1, 5; 763 NW2d 1 (2008).

After a bench trial, we review the trial court's findings of fact for clear error and its conclusions of law de novo. *Florence Cement Co v Vettraino*, 292 Mich App 461, 468; 807 NW2d 917 (2011). "As with other findings of fact, an award of damages is reviewed on appeal pursuant to the clearly erroneous standard." *Triple E Produce Corp v Mastronardi Produce, Ltd*, 209 Mich App 165, 177; 530 NW2d 772 (1995). "A factual finding is clearly erroneous if there is no substantial evidence to sustain it or if, although there is some evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has" occurred. *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 173-173; 848 NW2d 95 (2014).

## III. CONSTRUCTION OF THE GUARANTY CONTRACT

Defendants first argue that the trial court erroneously interpreted the guaranty executed by Canvasser and, as a result, improperly granted summary disposition in favor of plaintiff with regard to Canvasser's liability and incorrectly ruled that Canvasser remained liable for a portion of SC STA's debt under the final judgment and after proceeds from the foreclosure were applied to the debt. We disagree.

## A. RULES OF CONTRACT INTERPRETATION

The following standards of review and rules of interpretation are applicable in contract cases:

> We review de novo questions involving the proper interpretation of a contract. In ascertaining the meaning of a contract, we give the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument. We must give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory. We cannot read words into the plain language of a contract. [*Northline Excavating, Inc v Livingston Co*, 302 Mich App 621, 627-628; 839 NW2d 693 (2013) (quotation marks and citations omitted).]

Likewise, "all [of a contract's] parts are to be harmonized so far as reasonably possible[.]" *Comerica Bank v Cohen*, 291 Mich App 40, 46; 805 NW2d 544 (2010) (quotation marks and citation omitted). "If the language of the contract is unambiguous, we construe and enforce the contract as written. Thus, an unambiguous contractual provision is reflective of the parties' intent as a matter of law. Once discerned, the intent of the parties will be enforced unless it is contrary to public policy." *Quality Products & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375; 666 NW2d 251 (2003) (citations omitted).

"Contracts of guaranty are to be construed like other contracts, and the intent of the parties, as collected from the whole instrument and the subject-matter to which it applies, is to govern." *Comerica Bank*, 291 Mich App at 46 (quotation marks and citation omitted). However, the Michigan Supreme Court has recognized that "a guaranty contract—like a surety contract—is a special kind of contract,"[3] and has applied to guaranty contracts the principles of construction that apply to surety contracts. *Bandit Indus, Inc v Hobbs Int'l, Inc (After Remand)*, 463 Mich 504, 511-512; 620 NW2d 531 (2001) (citations omitted).

> The undertaking of a surety is to receive a strict interpretation. . . . The liability of a surety is not to be extended by implication beyond the terms of his contract. A surety cannot be held beyond the precise terms of his agreement. . . . [*Id*. (quotation marks and citations omitted).]

## B. APPLICATION

Defendants argue that the trial court erroneously disregarded the word "top" in interpreting the extent of Canvasser's liability, emphasizing that the adjective "top" serves as a limitation of Canvasser's liability and asserting that Canvasser's liability was limited to the "top 25%" of the outstanding indebtedness at the time of default minus any amount subsequently received by plaintiff, including proceeds from foreclosure on the mortgage.[4] The plain language of the guaranty provides otherwise, and we cannot identify any provision in the agreement that could reasonably be construed as supporting Canvasser's contention that SC STA's outstanding liability was required to be fixed at a particular time for purposes of determining his liability.

The guaranty states, "The Undersigned, Mark A. Canvasser and David L. Steuer, hereby unconditionally guarantee the full and prompt payment and collection *when due*, whether by acceleration or otherwise, *and at all times hereafter*, of: (a) the top twenty five percent (25 %) of the outstanding indebtedness on the Mortgage Note . . . ." (Emphasis added.) Additionally, the guaranty also provides, "Any amount received by Lender from whatever source and applied by it toward the payment of the Liabilities shall be applied in such order of application as Lender may from time to time elect." Given this clear and unambiguous language, and the absence of any language setting a time for establishing the amount of Canvasser's liability, the trial court properly concluded that the plain language of the guaranty does not establish a particular time for

---

[3] A surety and a guarantor are similar in that both "promise to answer for the debt or default of another," but the primary distinction between a surety contract and a guaranty contract is as follows: " '[W]hile the surety assumes liability as a regular party to the primary undertaking, the guarantor does not, as his or her liability depends on an independent collateral agreement by which he or she undertakes to pay the obligation if the primary payor fails to do so.' " *Bandit Indus*, 463 Mich at 507-508 n 4, quoting 23 Michigan Civil Jurisprudence, Surety, § 14, p 50.

[4] Similarly, defendants also contend that even if the trial court correctly calculated the outstanding liability of SC STA, the court should have interpreted the guaranty to demand no further repayment from Canvasser because plaintiff could receive from SC STA more than 25% of outstanding debt.

the calculation of Canvasser's liability and does not prescribe a particular timeframe or order for applying payments in the calculation of SC STA's outstanding debt for purposes of determining Canvasser's "top 25%" share. Similarly, the trial court properly found that the guaranty includes no provision that could be reasonably construed as indicating that SC STA's outstanding liability had to be fixed at a particular time. Rather, the guaranty indicates that Canvasser remains liable for the "top 25%" of SC STA's outstanding liability when payment on the loan is due *and* "at all times hereafter."

Defendants assert on appeal that both parties agreed in the trial court that the word "top" means that Canvasser promised to pay the first or initial 25% portion of SC STA's liability under the promissory note and only disagreed as to the time at which the "top" is calculated and the effect of proceeds from foreclosure on the "top." On this basis, defendants assert that the meaning of "top" is unambiguous and that "the trial court erred in failing to ascribe any meaning to it." However, the record shows that the trial court considered the word "top" and properly construed the plain language of the guaranty. Additionally, as the trial court recognized, the word "outstanding" is significant in ascertaining Canvasser's obligations under the guaranty and in construing the word "top." The plain meaning of "outstanding," which is not defined in the guaranty or the loan agreement,[5] under these circumstances is "unpaid" or "continuing to exist." *Merriam-Webster's Collegiate Dictionary* (11th ed). Likewise, in *Black's Law Dictionary* (10th ed), "outstanding" is defined as "[u]npaid; uncollected <outstanding debts>." Thus, in construing the guaranty as a whole and in a manner that harmonizes its provisions as much as reasonably possible, *Comerica Bank*, 291 Mich App at 46, we conclude that the ordinary meaning of the guaranty was that Canvasser unconditionally promised to pay the first or initial 25% of SC STA's unpaid or uncollected debt when the debt was due, or at any time after it became due, regardless of any other payments received by plaintiff.

Defendants also incorrectly assert that plaintiff was required to foreclose on the leasehold mortgage and subtract the proceeds from SC STA's outstanding indebtedness before calculating Canvasser's 25% liability. Likewise, we reject defendants' argument that the trial court erred in denying Canvasser's request that all funds collected by plaintiff be applied to the "top" portion of the debt in a manner that satisfies Canvasser's obligation under the guaranty. The following clear and unambiguous language in the guaranty belies defendants' claims:

> The obligations of the undersigned hereunder are independent of the obligations of Borrower [SC STA], and *a separate action or actions for payment, damages or performance may be brought and prosecuted against the undersigned, or any one of them, whether or not an action is brought against Borrower or the security for Borrower's obligations*, and whether or not Borrower be joined in any such action or actions, and whether or not notice be given or demand be made upon Borrower.

---

[5] "Courts may consult dictionary definitions to ascertain the plain and ordinary meaning of terms undefined in an agreement." *Holland v Trinity Health Care Corp*, 287 Mich App 524, 527-528; 791 NW2d 724 (2010).

*Lender may, from time to time, without notice to the undersigned . . . and without affecting, diminishing or releasing the liability of the undersigned . . . (g) resort to the undersigned . . . for payment of any of the Liabilities, or any portion thereof, whether or not Lender shall have resorted to any property securing any of the Liabilities or any obligation hereunder or shall have proceeded against any other of the undersigned or any other party primarily or secondarily liable on any of the Liabilities . . . .* [Emphasis added.]

This language plainly allows plaintiff to (1) seek recovery from Canvasser without first seeking recovery through foreclosure of the leasehold mortgage and (2) file suit against Canvasser for damages, payment, or performance without first filing suit against SC STA or otherwise recovering from SC STA. See *Comerica Bank*, 291 Mich App at 47-48 (holding, with regard to a guaranty agreement that included terms similar to those in this case, that "[t]he plain language of the limited guarant[y] forecloses defendant's arguments" that the plaintiff was required to foreclose on the collateral before collecting on the guaranty).

Therefore, consistent with our duty to read the language of the contact as a whole and "harmonize[] [its parts] so far as reasonably possible[,]" *id*. at 46 (quotation marks and citation omitted), we conclude that defendants' interpretation of "top" is not supported by the precise terms of the agreement, and plaintiff was not required to foreclose on the leasehold mortgage at a particular time or apply the proceeds from the foreclosure or other funds received from SC STA in a manner that satisfied Canvasser's liability under the guaranty, see *Bandit Indus*, 463 Mich at 511-512.

## IV. MITIGATION OF DAMAGES

Next, defendants argue that the trial court incorrectly denied their motion to compel plaintiff to mitigate its damages by foreclosing on the leasehold mortgage. Additionally, defendants contend that, after the bench trial, the trial court erroneously found that plaintiff had pursued reasonable mitigation efforts, arguing "that the [l]easehold [m]ortgage held as collateral was a depleting asset,"[6] and that the trial court failed to adequately explain how any funds advanced by plaintiff preserved the collateral. We disagree.

---

[6] Defendants briefly assert for the first time in their reply brief that the trial court erred in "foreclosing from consideration at trial the reasonableness of what [plaintiff] now claims were efforts to mitigate." "Reply briefs must be confined to rebuttal, and a party may not raise new or additional arguments in its reply brief." *Kinder Morgan Michigan, LLC v City of Jackson*, 277 Mich App 159, 174; 744 NW2d 184 (2007), citing MCR 7.212(G). Nevertheless, the record does not support defendants' claim that the trial court precluded consideration of this issue at trial. The reasonableness of plaintiff's mitigation efforts was an issue specifically identified by defendants in the joint final pretrial order, plaintiff expressly acknowledged defendants' argument regarding its mitigation efforts during its opening statement at trial, and defense counsel extensively cross-examined witnesses at trial regarding the reasonableness of plaintiff's mitigation efforts.

## A. APPLICABLE LAW

"Mitigation of damages is a legal doctrine that seeks to minimize the economic harm arising from wrongdoing." *Morris v Clawson Tank Co*, 459 Mich 256, 263; 587 NW2d 253 (1998). "The question whether [a] plaintiff's efforts to mitigate damages were reasonable under the circumstances is one for the trier of fact." *Id*. at 270. A plaintiff's duty to reasonably mitigate its damages is as follows:

> Where one person has committed a tort, breach of contract, or other legal wrong against another, it is incumbent upon the latter to use such means as are reasonable under the circumstances to avoid or minimize the damages. The person wronged cannot recover for any item of damage which could thus have been avoided. [*Id*. at 263-264 (quotation marks and citation omitted).]

Because "[t]he failure to mitigate damages is an affirmative defense," *Fothergill v McKay Press*, 374 Mich 138, 140; 132 NW2d 144 (1965), "[t]he defendant bears the burden of proving that the plaintiff failed to make reasonable efforts to mitigate damages," *Morris*, 459 Mich at 266.

## B. APPLICATION

## 1. FORECLOSURE

First, the trial correctly rejected defendants' claim, under their motion to compel plaintiff to mitigate its damages by foreclosing on the leasehold mortgage, that plaintiff had to pursue foreclosure on the leasehold mortgage before it could seek damages from Canvasser. As we explained *supra*, the plain language of the guaranty did not require plaintiff to foreclose on the leasehold interest. Given the clear intent of the parties under the guaranty agreement, see *Comerica Bank*, 291 Mich App at 46, it would be counterintuitive to conclude that foreclosure was a means of mitigation required before it could seek damages from Canvasser, see *Morris*, 459 Mich at 263-264. In addition, the leasehold mortgage indicates that plaintiff was permitted to commerce foreclosure proceedings, but was not required to do so, in the event of default, and that plaintiff could "[s]eek the [court] appointment . . . of a receiver to manage the mortgage premises and collect rent profits and income therefrom." As such, there is no indication that foreclosure was the *only* reasonable means to avoid or minimize plaintiff's damages, especially in light of the other remedies identified in the leasehold mortgage. See *Quality Products*, 469 Mich at 375. Likewise, "the intent of the parties will be enforced unless it is contrary to public policy," *id*. (citations omitted), and, for the same reason, there is no indication that the agreement was contrary to public policy in this case.

Again, mitigation is an affirmative defense, which a defendant must plead and adequately support with proofs at trial. *Lawrence v Will Darrah & Assoc, Inc*, 445 Mich 1, 15; 516 NW2d 43 (1994). Under the legal doctrine of mitigation, a plaintiff generally cannot later *recover* damages which could have been avoided by reasonable effort or expenditure. *Morris*, 459 Mich at 263-264. We find no basis for concluding, and defendants have provided no authority indicating, that the trial court erred in failing to *compel* mitigation; instead, the proper remedy is precluding damages when a plaintiff failed to make reasonable efforts to mitigate those damages.

See *id*. at 263-266.  As the trial court concluded, plaintiff continued to have a duty to mitigate its damages, but it was not required to foreclose on the leasehold mortgage.

## 2.  REASONABLE MITIGATION EFFORTS

Next, we reject defendants' claim that the trial court erred in finding that plaintiff fulfilled its duty to mitigate its damages.  In its opinion and order entered after the trial, the court concluded that plaintiff reasonably mitigated its damages based on upon the following reasoning:

> [Plaintiff] sought the appointment of a receiver early on in this litigation and as a result of the receiver's efforts, [plaintiff] has maintained the value of its security. . . . . [Plaintiff] also has advanced a substantial amount of funds to avoid tax forfeiture, defaults, vacancies and waste on the property.  Had [plaintiff] not taken these steps, it logically follows that the building would be worth substantially less than it is today. . . .

Given the unrebutted evidence that plaintiff introduced establishing its mitigation efforts, the trial court's conclusion is not in error.  See *id*. at 263, 266.

At trial, Perry Allen, a portfolio manager for plaintiff, testified that as of September 2011, defendants owed plaintiff $88,591.30 for "tax escrow" payments, and plaintiff continuously advanced funds for the payment of the real property taxes on the property since 2009 in order to avoid property tax foreclosure and the penalties and late fees associated with delinquent property taxes.  Allen also testified that plaintiff had paid approximately $190,000 in expenses necessary to preserve, protect, and improve the physical condition and income potential of the collateral in order to preserve its interest in the commercial property.  These expenses, which were incurred based on the decisions of the court-appointed receiver, were associated with securing a large tenant, making repairs and improvements on the property necessary to secure that tenant, performing other maintenance on the premises, and maintaining insurance.  Plaintiff's advances also covered monthly lease payments owed by SC STA under the ground lease in order to preserve its interest in the property, as the ground lessor was permitted to initiate termination of the ground lease or eviction upon default.

David Gronbach, an employee of court-appointed receiver Retail Center Management, LLC, which assumed possession and full control over the premises in 2009, similarly testified that plaintiff protectively advanced funds for approximately $100,000 in property maintenance and repairs, including renovations that were necessary to make the space "habitable" or "leaseable" to property's largest, or "anchor," tenant, which only became a tenant following the appointment of a receiver.  Gronbach also recalled that he had paid SC STA's monthly lease payments, real property taxes, and insurance with funds supplied by plaintiff, although the lease payments and insurance premiums were paid out of the operating fund once the fund included sufficient capital—from leasing additional space and properly managing the premises—to cover the payments.  Likewise, according to Gronbach, the commercial property's cash flow increased after the appointment of a receiver, and all of the protective advances were necessary and commercially reasonable.

Defendants presented no evidence at trial rebutting plaintiff's mitigation efforts and only attempted to undermine plaintiff's efforts through cross-examination, which only elicited additional testimony supporting the conclusion that plaintiff's mitigation efforts were reasonable.[7]

Thus, on this record, we cannot conclude that the trial court's ruling was clearly erroneous, as defendants failed to sustain their "burden of proving that . . . plaintiff failed to make reasonable efforts to mitigate damages." *Morris*, 459 Mich at 266.

## V. LIABILITY FOR PROTECTIVE ADVANCES

Lastly, defendants contend that none of them are liable for the protective advances paid by plaintiff to the receiver, arguing that the advances were made for the protection of the underlying real property, not for the priority and protection of plaintiff's interest under the leasehold mortgage. We disagree.

Defendants' characterization of plaintiff's interest in the commercial property is not supported by the express terms of the leasehold mortgage. The mortgage covers, *inter alia*, SC STA's "estate, title, interest, and rights" in the leased real property, the buildings on the premises, and the rents and profits arising from the buildings and the premises. Thus, it is apparent that the physical condition and the profitability of those components were relevant to plaintiff's preservation of the collateral securing the loan.

Defendants also emphasize the language of the guaranty, which guarantees payment of "any indebtedness resulting from advances made on Borrowers [sic] behalf by Lender to *protect or preserve the priority and security of its first lien*," and briefly acknowledge that the leasehold mortgage permits expenditures to preserve the premises. (Emphasis added.) However, defendants fail to recognize that the plain language of the leasehold mortgage undermines their claim that they are not liable for money advanced by plaintiff to the receiver. See *Quality Products*, 469 Mich at 375.

In relevant part, sections "seventh," "eighth," "tenth," and "twenty-second" of the leasehold mortgage provide that (1) plaintiff may make advances or pay taxes and assessments, procure and maintain insurance, and make necessary repairs to the premises if SC STA defaults on its obligation to do so; (2) SC STA is responsible for payment of those expenditures, and payment is secured by the mortgage; (3) if the premises or any part of the premises, in the sole discretion of plaintiff, requires "inspection, repair, care or attention of any kind or nature not

---

[7] On appeal, in support of their claim that foreclosure was the only reasonable means of mitigation, defendants heavily rely on defendant Canvasser's statement in an affidavit that SC STA's leasehold interest was a depleting asset. However, even if we assume that is the case, that fact does not, on its own, demonstrate that plaintiff's mitigation efforts were unreasonable given the lack of evidence regarding the rate at which the asset was depleting, especially in light of the testimony indicating that plaintiff's efforts were commercially reasonable and actually preserved the value of the leasehold interest.

theretofore provided by [SC STA], [plaintiff] may . . . enter or cause entry to be made upon the [p]remises and inspect, repair and/or maintain the same as [plaintiff] may deem necessary or advisable, and may . . . make such expenditures and outlays of money as [plaintiff] may deem appropriate for the preservation of the premises"; (4) SC STA is responsible for payment of expenditures or outlays for repairs or maintenance that plaintiff finds necessary for the preservation of the premises, and payment is secured by the mortgage; (5) if SC STA defaults on its obligations under the mortgage, plaintiff may request that the court appoint "a receiver to manage the mortgaged premises and collect rent profits and income therefrom"; (6) if SC STA fails to comply with any of the terms, covenants, and conditions under the ground lease,[8] plaintiff may take any action that it deems necessary or desirable to prevent or cure SC STA's default under the lease and may expend any sum of money, at plaintiff's sole discretion, that is necessary to prevent or cure the default; and (7) SC STA is liable for payment of any funds expended by plaintiff in order to prevent or cure SC STA's default under the ground lease, and payment is secured by the mortgage.

Further, the clear and unambiguous language of the guaranty make Canvasser liable for the top 25% of SC STA's outstanding indebtedness under the promissory note and "any indebtedness resulting from advances made on Borrower[']s behalf by Lender to protect or preserve the priority and security of its first lien." In addition, the guaranty made Canvasser liable for all of SC STA's obligations under the terms and conditions of the leasehold mortgage:

> The undersigned further unconditionally guarantee the faithful, prompt and complete compliance by Borrower with all terms and conditions of the Mortgage Note, the Mortgage securing payment of the Liabilities and all other agreements, documents and instruments securing payment of the Liabilities or related thereto (such Mortgage Note, Mortgage and all other instruments collectively referred to hereinafter as the "Loan Documents") and the payment of all costs, expenses, charges and other expenditures required to be made by Borrower, or which Borrower agrees to make, under the terms and provisions of any Loan Document.

Accordingly, given the unrebutted evidence presented at trial establishing that the protective advances were made in accordance with the decisions of the court-appointed receiver and in accordance with the provisions of the mortgage, we conclude that the trial court did not err in finding SC STA and Canvasser liable for the protective advances.

## VI. CONCLUSION

Defendants have failed to establish that the trial court improperly interpreted the language of the guaranty contract. Further, defendants have failed to show that the trial court erroneously

---

[8] Under section 13 of the ground lease, the "[t]enant makes all repairs, including structural repairs to the plate glass, required to maintain the demised premises in the condition required in order for [the t]enant to conduct its business in the demised premises and to fulfill the requirement of any public authority having jurisdiction over the same."

concluded that plaintiff met its duty to mitigate its damages or erroneously found that SC STA and Canvasser were liable for the protective advances.

Affirmed.

/s/ Kathleen Jansen
/s/ William B. Murphy
/s/ Michael J. Riordan