# STATE OF MICHIGAN

# COURT OF APPEALS

MICHIGAN DEPARTMENT OF
TRANSPORTATION,

        Plaintiff-Appellee/Cross-Appellant,

v

DETROIT INTERNATIONAL BRIDGE
COMPANY,

        Defendant-Appellant/Cross-
        Appellee,

and

SAFECO INSURANCE COMPANY OF
AMERICA,

        Defendant/Cross-Appellee.

UNPUBLISHED
October 23, 2014

No. 315453
Wayne Circuit Court
LC No. 09-015581-CK

---

MICHIGAN DEPARTMENT OF
TRANSPORTATION,

        Plaintiff-Appellee/Cross-Appellant,

v

DETROIT INTERNATIONAL BRIDGE
COMPANY,

        Defendant-Appellant/Cross-
        Appellee,

and

SAFECO INSURANCE COMPANY OF
AMERICA,

        Defendant/Cross-Appellee.

No. 315847
Wayne Circuit Court
LC No. 09-015581-CK

-1-

MICHIGAN DEPARTMENT OF
TRANSPORTATION,

      Plaintiff-Appellee/Cross-Appellant,

v                                     No.   315912
                                           Wayne Circuit Court
DETROIT INTERNATIONAL BRIDGE          LC No.   09-015581-CK
COMPANY,

      Defendant-Appellant/Cross-
            Appellee,

and

SAFECO INSURANCE COMPANY OF
AMERICA,

      Defendant/Cross-Appellee.

Before:  BOONSTRA, P.J., and MARKEY and K. F. KELLY, JJ.

PER CURIAM.

In Docket No. 315453, Detroit International Bridge Company (DIBC) appeals as of right from a December 18, 2012 final order entered by Judge Prentis Edwards, raising issues dating back to Judge Edwards' February 1, 2010 order granting partial summary disposition in favor of Michigan Department of Transportation (MDOT).  MDOT has filed a claim of cross appeal, seeking to reverse an amended order dated April 8, 2013 that was entered by Judge Edwards' successor – Judge David Allen – which adjusted the amount of damages.

In Docket No. 315847, DIBC appeals as of right from Judge Allen's April 8, 2013 order, which denied DIBC's post judgment motions.  MDOT has filed a claim of cross appeal of that same order.

Finally, in Docket No. 315912, DIBC's surety, Safeco Insurance Company of America (Safeco), appeals as of right from Judge Allen's March 20, 2013 and April 8, 2013 orders, which found Safeco's liability coextensive with that of its principal DIBC.  Although MDOT has filed a claim of cross appeal, it has not raised any issues pertaining to that order as it relates to Safeco.

The three cases have been consolidated for appeal.  *Dep't of Transp v Detroit Int'l Bridge Co*, unpublished order of the Court of Appeals, entered May 8, 2013 (Docket Nos. 315453, 315847, and 315912).  We affirm the trial court's order granting MDOT partial summary disposition as well as the March 20, 2013 order denying DIBC post judgment relief.  However, the trial court was divested of jurisdiction to amend its March 20, 2013 order, rendering its April 8, 2013 order void for lack of jurisdiction.  Finally, we affirm the judgment against Safeco, whose liability was coextensive with DIBC's liability.

# I. BASIC FACTS AND PROCEDURAL HISTORY

This case has been before this Court on numerous occasions. The factual background has been fully detailed in at least two opinions and will not be set forth here. See *In re Moroun*, 295 Mich App 312; 814 NW2d 319 (2012); *DIBC v MDOT*, unpublished opinion of the Court of Appeals, issued December 6, 2011 (Docket No. 298276).

On remand from this Court's *In re Moroun* decision, the trial court conducted further hearings on February 9, 2012 and March 8, 2012. In its March 8, 2012 order, the trial court noted:

> DIBC has shown a complete disregard for the February 1, 2010 Order of this Court. DIBC is not presently complying and it does not appear that it intends to comply with the Order of this Court. DIBC continues to disobey the Order of this Court. Efforts taken by this Court to coerce compliance to this point have not been successful. Given the steadfast position of resistance to compliance with the February 1, 2010 Order exhibited by DIBC, it appears unrealistic to expect that DIBC's portion of the Project will be completed within a reasonable time if it maintains control over the construction process.

> * * *

> DIBC's efforts to grind to a halt an ordinary contract matter has forced this Court to come to no other conclusion but that DIBC is not committed to complying with the February 1, 2010 Order. This Court has exhausted every reasonable avenue available to it to expedite DIBC's compliance. While DIBC has deluged this Court with paperwork, its work on the Project has been comparatively barren. Therefore, after considering all options, this Court has no choice but to order MDOT to complete DIBC's portion of the Project in compliance with the February 1, 2010 Order.

Judge Edwards further directed DIBC to pay $16 million into an account to fund the project and to fully cooperate with MDOT.[1]

The matter then proceeded to bench trial on the issue of damages. In its December 13, 2012 order, the trial court indicated that there were three general categories for damages: 1) expenses for the acquisition of property; 2) expenses for the construction of the S32 bridge; and, 3) expenses for the repair of local surface streets. The parties had entered into a partial settlement whereby DIBC agreed to pay MDOT $1,273,402.97 for land acquisition, $165,937.12 for interest, and $627,517.62 for repair of

---

[1] This Court denied DIBC's application for leave to appeal *Dep't of Transp v Detroit Int'l Bridge Co*, unpublished order of the Court of Appeals, entered April 12, 2012 (Docket No. 309389). The Supreme Court denied DIBC's emergency application for leave. *Dept' of Transp v Detroit Int'l Bridge Co*, 491 Mich 912 (2012).

local surface streets.[2]  After hearing testimony from the parties' experts, the trial court noted that DIBC had not contested the validity of any of the invoices and the fact that DIBC may have been able to construct S32 more cost effectively was irrelevant.  The trial court accepted Victor Judnic's testimony that the construction cost of $2,395,163.60 was reasonable and necessary for the construction of S32.

DIBC filed a motion for evidentiary hearing on December 11, 2012, requesting that it be afforded the opportunity to explore the propriety of MDOT's expenditures to determine what amount, if any, MDOT was entitled to use or retain from the $16,000,000 special fund.  For its part, MDOT filed an emergency motion for a final order to close out the escrow account and release MDOT from its obligations under the March 8, 2012 order.

On December 14, 2012, MDOT submitted the financial statements for the month ending November 30, 2012, which reflected a total fund balance of $3,400,819.  On December 17, 2012, MDOT submitted the financial statements "from December 1, 2012 and ending December 13, 2012 and Financial Statement of Revenues and Expenditures – Cash Basis for the period December 14, 2012 through Project Completion Date . . .", which reflected a "forecasted" fund balance of $1,435,793.11.

At the December 18, 2012 hearing on MDOT's motion for a final order, the trial court indicated: "I'm satisfied after reviewing all of the materials that have been submitted that [MDOT] has fully complied with the provisions of the March 8th order in construction of Part A; that, the Bridge, [DIBC's] Portion of the Ambassador Bridge Gateway Project."  The trial court concluded:

> So with that I am satisfied again that [MDOT] has fulfilled its obligation under the March 8th, order of this Court.  The funds that are remaining from the $16 million that was placed in the special account will be credited towards the award that was given in the December 12th, I believe 13th.
>
> MR. MOL:  13th.
>
> THE COURT:  December 13th order that the Court entered and this will close out the last remaining claim in this case and it closes out the case.

The trial court entered a final order on that same day.  The trial court indicated that $3,400,819 remained in the special fund.  It ordered that MDOT close out the special fund and credit the remaining balance to the damages awarded in the December 13, 2012 order.

That same day, MDOT filed a "request for correction of a final order," wherein it pointed out that the trial court erroneously referenced a fund balance of $3,400,819.00.  MDOT wrote that the final fund balance was, in fact, $1,435,793.11.

---

[2] The trial court originally indicated that the agreed-upon amount was $625,517.62, but later entered an order correcting a clerical mistake to add $2,000 additional dollars (12/17/12 Order Correcting Clerical Mistake).

A motion hearing was held on January 18, 2013 before Judge David Allen, at which time various motions were heard, including DIBC's request to be heard on the proper charge against the special fund and whether Judge Edwards made a calculating mistake in his December 18th order. On March 20, 2013, Judge Allen entered an order denying DIBC's post-judgment motions. Judge Allen noted:

> On December 13, 2012, the Court issued an Opinion and Order determining the amount of damages owed to MDOT for DIBC's breach of contract. The Court ordered DIBC to pay MDOT a total $4,462,021.31. . . .
>
> On December 18, 2012, the Court issued its Final Order directing MDOT to close out the special account established for the construction of Part A and to credit the amount remaining in the account toward the December 13, 2012 award. The amount remaining in the account at closeout was $1,435,793.11. The damages now remaining against DIBC and its surety, Safeco Insurance Company of America, (whose liability is coextensive with that of its principal), is $3,026,228.20.
>
> ***
>
> IT IS FINALLY ORDERED that DIBC and Safeco are jointly and severally liable for the remaining breach of contract damages in the amount of $3,026,228.20, as Safeco's liability as surety is coextensive with that of its principal DIBC.

DIBC filed its claim of appeal in this Court on March 28, 2013.

On April 8, 2013, Judge Allen agreed to modify the March 20, 2013 order and found that the total remaining breach of contract damages was $1,059,202.31.

MDOT then filed a cross-appeal in Docket No. 315453 on April 17, 2013, referencing the April 8th order.

On April 23, 2013, DIBC filed its claim of appeal with this Court from Judge Allen's April 8, 2013 order based on Judge Allen's denial of their motion for reconsideration. MDOT cross appeals from that same order.

## II. SUMMARY DISPOSITION

DIBC argues that the trial court erred in granting MDOT summary disposition because the trial erroneously concluded that the parties reached an "agreed design." In light of the fact that Part A is now complete, the issue is moot.

> This Court's duty is to consider and decide actual cases and controversies. We generally do not address moot questions or declare legal principles that have no practical effect in a case. An issue is moot if an event has occurred that renders it impossible for the court to grant relief. An issue is also moot when a judgment, if entered, cannot for any reason have a practical legal effect on the existing controversy. However, a moot issue will be reviewed if it is publicly significant, likely to recur, and yet likely to evade judicial review. [*Barrow v Detroit Election Commission*, ___ Mich App ___: ___ NW2d

___ (Docket Nos. 317540, 318683, 318828, issued June 17, 2014) slip op p 5 (internal citations and quotation marks omitted).]

DIBC acknowledges that "this appeal does not seek to reverse the circuit court's various rulings in this case for the purpose of compelling MDOT to reconstruct the Gateway Project as DIBC believes it should have been constructed" but that the summary disposition order served as the basis for a series of later legal rulings. DIBC then points to the numerous instances where it was sanctioned for filing motions to have the February 2010 order set aside and for failing to abide by the terms of the order. However, even if this Court were to conclude that the February 2010 order was improvidently entered, neither DIBC nor its officers were relieved from complying with the order. "Contempt of court is a wilful act, omission, or statement that tends to impair the authority or impede the functioning of a court. Courts have inherent independent authority, as well as statutory authority, to punish a person for contempt." *In re Robertson*, 209 Mich App 433, 436; 531 NW2d 763 (1995). Such authority preserves the effectiveness and power of the courts. *Arbor Farms, LLC v Geostar Corp*, ___ Mich App ___; ___ NW2d ___ (Docket No 314911, issued May 27, 2014), slip op p 7. "[A]n order of the court must be complied with at the time it is entered even if the order is clearly incorrect or it is set aside on appeal." *Johnson v White,* 261 Mich App 332, 346; 682 NW2d 505 (2004) (internal citation omitted). "A person may not disregard a court order simply on the basis of his subjective view that the order is wrong or will be declared invalid on appeal." *Id.* (internal quotation marks omitted). DIBC was obligated to comply with the trial court's February 2010 order, even if the order was wrong. Therefore, DIBC is not entitled to any relief for sanctions arising from its subsequent contempt.

DIBC was stripped of its obligation to complete Part A of the project and that responsibility was handed over to MDOT and financed with $16,000,000 from a court-ordered special account financed by DIBC. DIBC argues that MDOT's cross-appeal "for an adjustment of what remained of the $16,000,000 is dependent on the correctness of the ruling that is the central focus of DIBC's appeal." However, DIBC was ordered to place the money into the special account because it was the only way the trial court could ensure compliance with its February 2010 order. "Circuit courts have jurisdiction and power to make any order proper to fully effectuate the circuit courts' jurisdiction and judgments." MCL 600.611. "This power is not governed so much by rule or statute, but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Muldonado v Ford Motor Co,* 476 Mich 372, 376; 719 NW2d 809 (2006). Therefore, the matter is moot because DIBC can be afforded no relief and the matter is neither publicly significant nor likely to recur.

Even if we were to conclude that the matter was not moot, we would nevertheless find no error in the trial court's order granting partial summary disposition. In interpreting a contract in a breach of contract action, "it is a court's obligation to determine the intent of the parties by examining the language of the contract according to its plain and ordinary meaning. If the contractual language is unambiguous, courts must interpret and enforce the contract as written because an unambiguous contract reflects the parties' intent as a matter of law." *In re Smith Trust*, 480 Mich 19, 24; 745 NW2d 754 (2008) (citations omitted).

The Implementation Agreement included a conceptual design for DIBC's portion of the project. This agreement stated under paragraph 2, "The PARTIES are in agreement with the PROJECT design concept depicted in EXHIBIT I." The agreement then set forth the obligations of the parties to prepare design work and required the parties to "mutually approve" base and final designs for Part A, B and F1.

-6-

Under the Amendatory Agreement, the parties specifically agreed to a revised design that included two concentric loops to be constructed to directly connect the bridge to the interstate highways. The Amendatory Agreement provided that Exhibit I and II had been updated "to reflect the current status of the completed design." Thus, the fact that these exhibits were stamped "preliminary and subject to change" is immaterial since the agreement referenced them as "completed design" and paragraph eight of the Implementation Agreement contemplated changes to the "base or final" plans for Parts A, B, and F2 but only with approval from MDOT.

Moreover, DIBC was clearly obligated to construct the access road on the easement. Paragraph 6 of the Amendatory Agreement requires DIBC to convey an easement "to extend from that property to a reasonably convenient public highway so as to provide access to the public highway system that is reasonably equivalent to the direct highway access that exists on the date of this AMENDMENT" and to construct "a paved driveway on that easement consistent with [MDOT's] standards for a paved two-lane road, to provide the replacement access." DIBC's obligation "to maintain that easement and driveway ends if the DIBC obtains ownership of the property to which the obligation otherwise attaches." These terms clearly indicate that DIBC did not have any discretion to change the location of the access road unless, in accordance with paragraph eight of the Implementation Agreement, MDOT gave its written approval. Thus, DIBC's argument regarding substantial performance by placing the road in another location is unpersuasive.

Furthermore, the Performance Bond confirms DIBC's obligation to construct its portion of the project in accordance with the designs contained in exhibit I and II of the agreements as well as the attached exhibit E. The bond provided that "the condition of this obligation is such that if the above named principal shall and will, well and faithfully, and fully, do execute and perform all of the obligations contained in the attached documents identified as Exhibits A through Exhibit E, listed below . . . . then this obligation is to be void, otherwise to remain in full force and effect." The bond further provided:

> Consistent with the obligation of this bond, the following are included and referenced as follows:
>
> Exhibit A:  Rights and obligations set forth in Agreement Number 2004-0213, dated April 23, 2004, between the Detroit International Bridge Company (DIBC) and the Michigan Department of Transportation (MDOT); and
>
> Exhibit B:  Amendatory Agreement Number 2004-0213/A1, dated February 17, 2006, between DIBC and MDOT; and
>
> Exhibit C:  October 31, 2006, letter from DIBC to MDOT; and
>
> Exhibit D:  October 6, 2006, letter from DIBC to MDOT; and
>
> Exhibit E:  Plans for DIBC portion of the Ambassador Bridge/Gateway Project (Part A, DIBC portion) per MDOT/DIBC agreement as amended.

The bond indicates that DIBC was obligated to "execute and perform" in accordance with the plans for DIBC portion of the project.

DIBC contends that the trial court erroneously concluded that the parties reached an "Agreed Design" reflected in the attachments to the Performance Bond, where this "inference" was expressly contradicted by the affidavits of Dan Stamper and Thomas LaCross and by paragraph 8 of the parties' Implementation Agreement. DIBC further points out that the drawings attached to the March 12, 2007 Performance Bond were marked "issued for review" and "for information only – not for construction" and therefore, the only reasonable inference the trial court could draw is that there was not an "Agreed Design." DIBC also contends that substantial factual dispute exists on the issues of whether there was a "final plan" to which DIBC is bound and whether the existing roadway constitutes substantial performance and whether the condemnation was necessary.

However, the plain language of the parties' agreements leaves no room for the type of interpretation DIBC asks this Court perform. DIBC mistakenly argues that "[t]he *sole* evidence supportive of the circuit court's conclusion that the parties had reached agreement on a *final* design plan was supplied in an affidavit signed by MDOT engineer, Victor Judnic." In so arguing, DIBC asks this Court to completely ignore the clear contractual language. The best evidence of DIBC's breach was the language of the contracts. The trial court could have granted summary disposition in MDOT's favor without reference to *any* of the affidavits. The language of the contracts requiring DIBC to act in accordance with the design plan, coupled with DIBC's admission that it did not act in conformity with the plan because it boldly concluded that the plans were no longer relevant, would have justified summary disposition in MDOT's favor. Thus, the competing affidavits were effectively irrelevant.

Therefore, it is clear from the contractual language that the parties intended for DIBC to construct Part A of the project in accordance with the design contained in exhibits I and II and exhibit E of the Performance Bond, leaving a factual development regarding the intent of the parties unnecessary. The plain language of the agreements is unambiguous, as conceded by counsel for DIBC. DIBC was not at liberty to unilaterally alter the parties' agreements as long as the gist of the design plan was met. However, the procedure set forth in paragraph eight of the Implementation Agreement for making material changes to the base or final design undermined many of the averments made by Stamper and LaCross. For example, if it truly was not necessary for DIBC to construct the access road over the easement or to construct the elevated ramps over 23rd Street, DIBC was clearly required to obtain MDOT's written approval since these improvements were contained in exhibits I and II to the agreements. Contrary to DIBC's argument, the trial court properly refused to allow the affidavits to contradict the clear terms of the parties' agreements.

There is no dispute that DIBC failed to construct Part A in accordance with the design plan, that it took over and closed 23rd Street without the city's permission, and built structures in accordance with a design not approved by MDOT. Therefore, the trial court properly entered summary disposition in MDOT's favor.

## III. JUDNIC'S AFFIDAVIT

DIBC argues that the trial court erred when it refused to set aside its February 1, 2010 order granting partial summary disposition where the "essential predicate" for the court's February 1, 2010 decision was Victor Judnic's inadmissible affidavit. We disagree.

A trial court's decision to deny a motion to set aside a prior judgment is reviewed for an abuse of discretion. *Heugel v Heugel*, 237 Mich App 471, 478; 603 NW2d 121 (1999).

On the first day of the December 2010 contempt hearing, Victor Judnic was called as a witness, and was questioned by DIBC's attorney, MDOT's attorney and the trial court. Judnic admitted that Exhibit E was a "concept drawing" and a "general plan." He testified that he was not involved in the Gateway Project until April 2007. He had nothing to do with the compilation of drawings for the performance bond. He had no personal knowledge concerning the creation or execution of the bond.

During the second day of his testimony, MDOT's attorney showed Judnic the affidavit that had been attached to MDOT's motion for summary disposition. MDOT's attorney then moved to admit the affidavit, which led to the following colloquy:

> MR. JOHN: My only objection, your Honor, is that this relates to matters before you issued your February 1st order, and I think earlier in this hearing when I attempted to do something with respect to matters before your February 1st order you would not hear of it, and so I'd raise the same objection that Mr. Mol raised at that point.
>
> THE COURT: What is it being offered for, Mr --- are you done? You're done?
>
> MR. JOHN: Yes, your Honor. Also it doesn't I think state that it was made on personal knowledge anywhere, if I understand correctly. [¶] The first says he just, first duly sworn states as follows and then at the end he says I could testify competently to the facts but none of it says it's on personal knowledge.
>
> THE COURT: What is this document being offered for?
>
> MR. MOL: Your Honor, this is the affidavit that Mr. Judnic submitted attached to MDOT's motion for Part A, which you granted. In it he identified the various conflicting structures and you granted our motion. I wanted to go through it and identify what he identified as being conflicting or construction that DIBC has not done, which your Honor granted, and identify whether since February 1 DIBC has completed those tasks.
>
> THE COURT: I believe Mr. John's motion – objection is correct. This is a hearsay document and it refers back to matters determined before February 1st. Although if he needs this to assist him in identifying those items that were supposed to be corrected he may do so, but the document itself will not be admitted as an exhibit.

On appeal, DIBC does not cite MCR 2.612 (pertaining to motions for relief from judgment) except to say that "[w]hether the circuit court was correct in its assessment of the timing requirements of MCR 2.612 is of no consequence here because the circuit court had the unquestioned authority to set aside its erroneously entered order under another court rule, MCR 2.604(A)." Thus, it appears that DIBC concedes that its motion was not timely.

It is true that a trial court has broad discretion to reconsider its previous rulings. MCR 2.119(F)(1) provides "[u]nless another rule provides a different procedure for reconsideration of a decision . . ., a motion for rehearing or reconsideration of the decision on a motion must be served and filed not later than 21 days after entry of an order deciding the motion." However, under MCR 2.604(A), a rule expressly referenced in MCR 2.119(F), an order that does not dispose of all issues in a case does not terminate the action and "is subject to revision before entry of final judgment adjudicating all the claims and the rights and liabilities of all the parties." "The court rules therefore give the trial

court explicit procedural authority to revisit an order while the proceedings are still pending and, on that reconsideration, to determine that the original order was mistaken . . ..” *Hill v City of Warren*, 276 Mich App 299, 307; 740 NW2d 706 (2007). Thus, while a trial court does not abuse its discretion in denying a motion for reconsideration that is filed outside of the time allotted, a trial court is not necessarily divested of its discretion to consider untimely motions for reconsideration. MCR 604(A) does not vest a party with a continuing substantive right to seek review of prior orders; it merely permits a trial court to revisit prior orders before entry of a final order. Here, the trial court declined to exercise its discretion.

In any event, DIBC's motion would have failed substantively even without a procedural irregularity. To the extent DIBC claims that the trial court erred in relying on inadmissible hearsay, while it is true that a party's affidavits are normally not admissible at trial (or at a contempt hearing as the trial court ruled in this matter), it is the substance or *content* that must be admissible, not the document itself. *Maiden,* 461 Mich at 123-124. Thus, while the affidavit was not admissible at the evidentiary hearing, the contents of Judnic's affidavit was sufficient to support the motion for summary disposition because it was based on his personal knowledge and Judnic averred that he was competent to testify about the substance of the affidavit. In fact, it is apparent that the trial court did not allow admission of the affidavit primarily due to the fact that Judnic was testifying at the contempt hearing and the trial court preferred to hear from him directly. However, the trial court's ruling did nothing to undermine the affidavit for purposes of the motions for summary disposition.

DIBC argues, however, that the affidavit was not based on personal knowledge and that "[i]t was Judnic, and Judnic alone, who represented to the court at the summary disposition stage that MDOT and DIBC had a final, agreed-upon design plan for Part A of the project. And, it was Judnic, and Judnic alone, who supplied the circuit court with the evidence it used to support its ruling that the final, agreed-upon version of the project design was to be found in the design drawings compiled in Exhibit E." However, as previously discussed, the trial court's February 1, 2010 order did not rely exclusively on Judnic's affidavit. In its order granting MDOT partial summary disposition, the trial court noted:

> The documentary evidence submitted by MDOT including the affidavit of Victor Judnic, indicated that DIBC has failed to construct a two lane truck road, an access easement, safeguard gate system, and access drive and gate for MDOT personnel as required by the agreement. . . . In Victor Judnic's affidavit, he explains that as Senior Delivery Engineer he is responsible for the Contract Administration of the Ambassador Bridge/Gateway Project. As Contract Administrator, he made a list of several design changes that he described as material changes and unapproved construction that are in conflict with the approved contract design.

The order further set forth that "[a]ccording to Victor Judnic's affidavit, MDOT cannot complete its portion of the project until DIBC constructs the truck road and bridges." In denying DIBC's motion for relief from judgment, the trial court explained:

> The affidavit of Victor Judnic, the Senior Delivery Engineer for MDOT who is responsible for the Contract Administration of the Ambassador Bridge Gateway Project, was one of the documents considered in deciding the motion for summary disposition. The documents attached to the affidavit or referred to had already been filed in this case and were in the possession of DIBC. The affidavit makes a brief reference to the background of the parties' agreements. The affidavit explains the project site plans and

Victor Judnic's observations regarding construction that had taken place. He also provides information based on his observations regarding construction on the site that conflicted with the design attached to the Performance Bond. The content of the affidavit would be admissible as evidence. Victor Judnic would be competent to testify regarding the content of the affidavit as he was allowed to do during the December 13, 2010 hearing.

The trial court concluded that even if there were portions of Judnic's affidavit that were not based on personal knowledge, it was not precluded from using other relevant portions. The trial court looked to the plain, clear, and unambiguous language of the parties' agreements in finding that DIBC was breaching its contract. The trial court relied on Judnic's affidavit, not to conclude that the parties' agreed to a "final" plan, but to conclude that DIBC had acted in contravention of the design plan, as contemplated by the documents. Judnic clearly had personal knowledge of the construction-related obligations under the contracts. DIBC's claim otherwise lacks merit.

## IV. JURISDICTION TO AMEND THE FINAL ORDER

MDOT argues that the trial court was divested of jurisdiction to amend its March 20, 2013 order, rendering its April 8, 2013 order void for lack of jurisdiction. We agree.

"Whether a court has subject-matter jurisdiction is a question of law subject to review de novo." *Davis v Dep't of Corrections*, 251 Mich App 372, 374; 651 NW2d 486 (2002). Likewise, "[t]he interpretation and application of court rules present questions of law to be reviewed de novo using the principles of statutory interpretation." *Lamkin v Engram*, 295 Mich App 701, 707; 815 NW2d 793 (2012).

Judge Allen lacked the ability to enter the April 8, 2013 order. MCR 7.208(A) provides, in relevant part, that "[a]fter a claim of appeal is filed or leave to appeal is granted, the trial court or tribunal may not set aside or amend the judgment or order appealed from except . . . (2) by stipulation of the parties . . ." See *In re ITC Application*, 304 Mich App 561, 575-576; 847 NW2d 684 (2014).[3] Thus, filing a claim of appeal prevents a trial court from amending its orders while the appeal is pending. *Hill v City of Warren*, 276 Mich App 299, 307; 740 NW2d 706 (2007).

There is no record evidence, as DIBC claims, that the amended order was a result of a stipulation between the parties. In fact, the record is silent as to a "stipulation." Instead, the signed hand-written proposed order merely indicates that the parties' attorneys agreed that the order accurately reflected Judge Allen's ruling at the April 5, 2013 hearing. DIBC cannot insinuate that the parties agreed to the modification, as the amount of damages was always a hotly contested issue. Because the trial court was divested of jurisdiction by virtue of MCR 7.208(A) and because the parties did not stipulate to the

---

[3] The trial court retains jurisdiction, however, over stays and bonds matters under MCR 7.208(F).

amendment, Judge Allen's April 8, 2013 is void for lack of jurisdiction. Judge Allen's March 20, 2013 must stand.[4]

## V. SURETY'S LIABILITY

On appeal, Safeco argues that the trial court erred in striking its answer and further erred by entering a default judgment against it. We disagree.

This Court reviews a trial court's decision on a motion to set aside a default for an abuse of discretion. *Shawl v Spence Brothers, Inc,* 280 Mich App 213, 220; 760 NW2d 674 (2008).

MDOT filed its action against DIBC and Safeco on June 24, 2009. Safeco, the surety of a $34,664,650 performance bond executed by DIBC on March 12, 2007, was served the complaint on June 25, 2009.

In an effort to resolve the parties' dispute without intervention of the courts, General Counsel for DIBC, Patrick Moran, suggested that the parties submit the matters to facilitation. As a result, MDOT and DIBC signed a facilitation agreement and selected retired Judge Gene Schnelz as the facilitator. As part of their agreement, if facilitation was not successful, the time for filing an answer to MDOT's complaint was enlarged to 21 days after facilitation concluded. After two attempts to facilitate the matter, the facilitation process concluded on August 6, 2010.

Craig John, an attorney retained by DIBC, requested an extension for DIBC to file its answer beyond the agreed-upon 21 days from facilitation. In a letter dated August 14, 2009, assistant attorney general Robert Mol states that "MDOT is agreeable to allowing DIBC an additional 21 days to file its answer. Thus, DIBC's answer to MDOT's complaint is due on or before September 17, 2009."

On August 28, 2010, MDOT filed a request for default against Safeco due to its failure to appear and/or to file an answer. A default was entered on the same day.

Thereafter, Safeco attempted to file an answer to the complaint, but MDOT successfully had the pleading stricken. At a September 18, 2009 hearing, the trial court addressed Safeco's concern that a default had only been "requested," not "entered":

> MR. NEDELMAN [for Safeco]: There has been a Request for a Default. There was no default. Because there was no default Safeco's Answer is timely. The Request to Strike it is improper because the Answer can't be filed only if a default had already been entered.
>
> THE COURT: Why do you say the default was not entered?

---

[4] Because the March 20, 2013 order stands, MDOT cannot be heard to complain regarding any "clerical error" in Judge Edwards' December 18, 2012 final order and its request that this Court correct the error or remand for further proceedings is unnecessary. In essence, by affirming the validity of the March 20, 2013 order entered by Judge Allen, MDOT will receive the relief it seeks on cross appeal.

-12-

MR. NEDELMAN: Your Honor, all that is of record is Mr. Mol's [for MDOT] Request. It is not signed by the Clerk of the Court. It is not – and there is a spot on the Request that Mr. Mol submitted to the Court for the Entry of the Default. That is not executed. The default has not been entered.

THE COURT: Well, I don't want to get too far involved with technicalities here, but I've reviewed the default and it's recorded in the, in all of the Court's entries that a default was entered on the 28th of August.

The way that a default is entered is that a stamp is placed on the Request with the date and it says "filed" and the signature of the, of the County Clerk . . .

\*\*\*

But I've looked at that and I think that satisfies the requirements of the statute. Once [the affidavit of sum certain] is presented it's stamped with the – it's not stamped where the signature line is but it's stamped on there, which is sufficient to satisfy the requirements of the Court Rule.

On October 2, 2009, attorney Michael Nedelman filed a motion to set aside the default on behalf of Safeco.[5] Safeco claimed that MDOT's request for a default was in violation of the agreement to extend the time for filing an answer to September 17, 2009. Safeco submitted an affidavit from attorney Moran, who claimed that he "personally advised MDOT that DIBC was representing the interests of Safeco" at the facilitation and that during the facilitation proceedings MDOT was advised and acknowledged that Safeco tendered its defense of the matter to DIBC, and that the parties agreed the extension for filing an answer applied to Safeco as well, including the extension to September 17, 2009. Judge Schnelz averred that on the first day of facilitation, he inquired about whether Safeco was participating, to which Moran clearly stated that DIBC "had taken up the defense of Safeco because the claims against Safeco were derivative of the claims against DIBC," and that both attorneys for MDOT (Mol and Isom) were present and heard the exchange. Judge Schnelz further stated that it was his understanding that any extension of time to act agreed to by MDOT for DIBC would include Safeco "since all parties knew Mr. Moran was acting as the attorney for both and there was no conversation to the contrary."

The motion also asserted that Safeco had a meritorious defense, being that the complaint failed to state a cause of action against Safeco and that MDOT breached the agreements with DIBC by unreasonably withholding its consent to DIBC's requested changes. In support, Safeco submitted affidavits from Patrick Moran and Dan Stamper, and relied upon DIBC's brief in support of its motion to dismiss.

MDOT filed a response claiming that it agreed to participate in facilitation with DIBC and to extend the time for filing an answer to the complaint, that Safeco did not sign the facilitation agreement,

---

[5] Subsequently, Safeco attempted to file an answer to MDOT's complaint, but the trial court granted MDOT's motion to strike.

that the letter sent by assistant AG Mol to attorney John only referenced the granting of an additional extension to DIBC for filing its answer, and that none of MDOT's representatives heard or had any information that DIBC was representing Safeco. With respect to this latter assertion, MDOT submitted affidavits of the attorneys and representatives who were present at the facilitation. MDOT further claimed that there never was a misunderstanding between counsel regarding the answer due date, but more a mistaken assumption by Moran and Safeco that the extension given to DIBC also applied to Safeco. Finally, MDOT argued that Safeco had not submitted an affidavit showing facts that it had a meritorious defense to the breach of contract claims.

On October 9, 2009, Nedelman and Mol appeared to argue their respective positions. In denying the motion, the trial court noted that a default had been entered:

> Now, it's important to note here that MCR 2.603 makes a distinction between a default and a default judgment. MCR 2.603(A) requires the clerk to enter a default if it's made to appear by affidavit or otherwise that a response has not been, not been made, and that is what we have in this case. On the other hand, the default provides the basis for the entry of a default judgment under MCR 2.603(D), and no default judgment has been entered in this case.
>
> ***
>
> The Defendant has failed to establish good cause. There's no proof here that an agreement for an extension, notwithstanding the representations made by Judge Schnelz, I reviewed his affidavit, and there's nothing in there indicating that there was an agreement to postpone or extend until September 17th.
>
> There's nothing included in any of the documentation that has been submitted that indicates that there was an agreement to extend the filing until September 17th for this Defendant.
>
> Insofar as the meritorious defense is concerned, and that's, before we even get to that we have to show good cause, and the Court is ruling that based on the representations that have been made, good cause has not been shown in this case.
>
> Further, insofar as a meritorious defense is concerned, the documents or affidavits of Pat Moran and Dan Stamper do not set forth facts to establish a meritorious defense. Their statements are conclusory. They do not set forth facts for a meritorious defense.

On appeal, Safeco argues that the trial court erred in refusing to set aside the default where good cause existed and a meritorious defense was demonstrated.

MCR 2.603(D), which governs motions to set aside a default, provides in relevant part:

> (1) A motion to set aside a default or a default judgment, except when grounded on the lack of jurisdiction over the defendant, shall be granted only if good cause is shown and an affidavit of facts showing a meritorious defense is filed.

A party establishes good cause by showing either (1) a procedural irregularity or defect or (2) a reasonable excuse for not complying with the requirements upon which the default is based. *Alken–Ziegler, Inc v Waterbury Headers Corp,* 461 Mich 219, 233; 600 NW2d 638 (1999).

Safeco failed to demonstrate good cause for failing to file an answer. Even if DIBC's attorneys represented the interests of Safeco during the facilitation and the initial extension for filing an answer applied to Safeco as well, once the facilitation concluded, DIBC's attorneys could no longer represent Safeco in the litigation. Indeed, Safeco acknowledges that its interests with DIBC were only partially aligned, and Safeco retained attorney Nedelman to set aside the default and otherwise defend in the matter filed by MDOT. It was incumbent upon Safeco to request an extension after the facilitation concluded, and there is no record to support that any extension was granted to Safeco beyond the 21 days following facilitation. Notably, the letter written by Mol only referenced DIBC in his agreement to extend the deadline for filing an answer to DIBC; thus, the extension given to DIBC clearly did not apply to Safeco. Because Safeco did not file the answer to MDOT's complaint by August 27, 2009, MDOT properly acquired entry of a default.

Furthermore, Safeco does not have a meritorious defense to MDOT's claims. As previously discussed, the trial court properly granted MDOT partial summary disposition on the breach of contract claims against DIBC. In *Will H Hall & Son, Inc v Ace Masonry Constr, Inc*, 260 Mich. App. 222, 229; 677 NW2d 51 (2003), this Court explained the nature of a surety contract:

> A suretyship contract requires three parties; a principal, an obligee, and a surety. A surety is one who undertakes to pay money or take any other action if the principal fails therein. The liability of a surety is limited by the scope of the liability of its principal and the precise terms of the surety agreement. In general, a surety may plead any defense available to the principal, and the liability of the surety is coextensive with the liability of the principal in the bond and can be extended no further.

The liability of a surety "is coextensive with the liability of the principal in the bond." *City of Ferndale v Florence Cement Co*, 269 Mich App 452, 462; 712 NW2d 522 (2006) (internal quotation marks omitted). Its liability is limited to the amount of the bond. *Northline Excavating, Inc v Livingston Co*, 302 Mich App 621, 629; 839 NW2d 693 (2013). Even if a surety is not a party to a breach of contract action, a judgment against the principal constitutes prima facie evidence of the surety's liability on the bond. *PR Post Corp v Maryland Casualty Co*, 403 Mich. 543, 547-548; 271 NW2d 521 (1978) quoting 74 AmJur2d, Suretyship, § 152, pp 108-109.

On appeal, Safeco claims that categorizing a surety's liability as simply coextensive with that of the principal is a "gross oversimplification and generalization" and that a surety is entitled to independently assert its rights and whatever defenses it may individually maintain as well as all defenses its principal has against actions initiated by the oblige. Safeco lists some available defenses such as:

> (1) material alterations or substitutions on the contract of suretyship with prejudice the surety's rights, including substation of the oblige or principal or release of the principle; (2) failure to give notice to the surety of the principal's default; (3) an untimely lawsuit or notice under the bond; (4) the fraud of the principal under certain circumstances; (5) the obligee's improper termination of the principal's contract; and (6) where the principal's default arose prior to the surety becomes liable under the bond.

-15-

However, Safeco never explains what, if any, defenses it would have or could have raised. Nor does Safeco adequately explain how its interests were not safeguarded by DIBC's rigorous defense. Safeco is obligated to pay on its bond because DIBC has been found liable for breach of contract and has materially breached its agreements with MDOT.

We affirm the orders granting MDOT partial summary disposition, denying DBIC's motion to set aside the order granting partial summary disposition, and entering judgment against Safeco. Because the trial court was divested of jurisdiction to amend its March 20, 2013 order, its April 8, 2013 order is void for lack of jurisdiction. Accordingly, we vacate the April 8, 2013 order.

/s/ Mark T. Boonstra
/s/ Jane E. Markey
/s/ Kirsten Frank Kelly